IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEWIS & CLARK OUTDOORS, INC. )
an Arkansas corporation, )
)
Plaintiff, )
)
v. ) Case No. 5:07-cv-05164
)
L.C. INDUSTRIES, INC., )
)
Defendant. )

## EXPERT REPORT OF RACHEL BLUE

### I.    Engagement

I have been engaged by the law firm of Friday, Eldredge & Clark which represents Lewis & Clark Outdoors, Inc. to review certain documents and materials in anticipation of offering testimony and opinions in this case. I anticipate being called as an expert witness in the trial of this case.

### II.    Qualifications

My background, experience and qualifications are outlined on my curriculum vitae attached as Exhibit A.

### III.    Publications Authored Within Last Ten Years

Publications I have authored or coauthored within the last ten years are listed on my curriculum vitae attached as Exhibit A.

### IV.    Other Cases in Which I Have Testified at Trial or By Deposition

Other cases in which I have testified at trial or by deposition are listed on Exhibit A.

-1-



V.     **Documents and Depositions Reviewed**

The documents, depositions and other materials that I have reviewed and relied upon in preparing this report are listed in Exhibit B.

VI.    **Summary of Expected Testimony**

Presently, I expect to testify on the following subjects:

1.     The practices and procedures of the U.S. Patent & Trademark Office (PTO) including the preparation, examination, and registration of U.S. Trademarks and the prosecution history of the following applications.

2.     The effect of prior filed applications or existing registrations on the issuance of Application No. 78/784105.

3.     Various infringement and fraud issues, as set forth herein. I may be called to testify in rebuttal concerning other matters.

VII.   **Examination Procedure at the USPTO**

A.     **Application Requirements**

A newly filed application at the PTO must contain the following information in order to receive a filing date:

The applicant's name and address.

A clear drawing of the mark.

A description of the goods and services that the trademark is used on or is intended to be used on.

A filing fee.

Applications may be based on a bona fide intent to use the mark in interstate commerce, actual use in commerce, or a home country registration in a member country of one of the various treaties to which the U.S. is a party. In the case of an intent to use application, the

applicant must submit proof of use in commerce (a specimen) and provide dates of first use in commerce that Congress can regulate (interstate or international commerce) before the application can mature to registration. These submissions are done by means of an Amendment to Allege Use or a Statement of Use.

Each application must also contain a verification, executed by the applicant or someone with color of authority to sign on the applicant's behalf, asserting that the applicant is the owner of the trademark, that the statements made in the application are true to the best of the declarant's knowledge, and that no other person is entitled to use the trademark being applied for. Applications are assigned sequential serial numbers based on filing dates, then are placed in line for examination by Examining Attorneys at the Patent and Trademark Office in the order they are received. *See* TMEP 702.01.

**B.     The Examination Process**

**1.     Patent and Trademark Office Procedure.**

My background as an examining attorney for seven (7) years in the U.S. Patent and Trademark Office ("USPTO") and my 13 years in a private practice devoted primarily to trademark preparation and prosecution allows me to offer the following information regarding general processes for the handling of trademark applications.

When a new application is filed with the USPTO, the applicant must submit an application which contains certain information, including the name of the trademark, the identification of goods and services upon which the trademark will be used or is being used. If the mark is in use, the dates of first use in commerce, both interstate and anywhere, must be stated on the application. If the mark is in use in commerce, the applicant must submit a specimen showing that use in commerce on all the goods and services listed in the application. The applicant must describe the method of affixation of the mark on the particular goods, i.e., on

labels for the goods, on advertising for services, etc.  Finally, the applicant must offer an affidavit in a form specified by 18 U.S.C. § 1001 which states that the applicant has a bona fide intent to use the mark in commerce in connection with the particular, or is using the mark in connection with the particular goods, as of the date specified; that the applicant knows of no other party who is entitled to use the mark on those goods.

Upon receiving the file for examination, the Examiner first conducts a search of the trademark or service mark listed in the application to determine whether there are any conflicting marks that are the subject of either a pending application with an earlier filing date or an issued and valid registration.  If the Examining Attorney finds that there are conflicting marks, or must communicate with the applicant regarding some other issue (usually missing or unclear information, or some other substantive reason to delay or deny registration) then the Examiner will issue an office action, offering the applicant an opportunity to respond to any substantive refusal to register the mark and/or correct any deficiencies in the application.  *See* Trademark Manual of Examining Procedure (hereafter TMEP) § 705.  If the examining attorney issues an office action with a "substantive" or statutory refusal, the applicant must respond in an attempt to persuade the Examiner to withdraw the refusal.  Any deficiencies or corrections (also known as "informalities") required by the Examiner must also be addressed.  If the applicant is successful in addressing all of the requirements and in persuading the Examiner to withdraw any substantive or statute based refusals, the application will be approved for publication.  Once approved, the application is published for a period of 30 days to allow third parties to object to its registration (known as the "opposition period").  If no opposition is filed, the mark is registered in due course.  After 5 years, a trademark on the Principal Register becomes "incontestable", meaning that it cannot be challenged except in very limited circumstances.

2. **Likelihood of Confusion.**

If the examining attorney's search reveals a prior pending or registered mark that appears to conflict with that of the applicant, the Examiner determines whether there is a likelihood of confusion between applicant's mark and a previously registered or filed mark.

### a. The DuPont Factors

*In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973), sets out the factors relevant to a determination of likelihood of confusion.

The thirteen factors in DuPont are:

1. The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression.

2. The similarity or dissimilarity and nature of the goods . . . described in an application or registration or in connection with which a prior mark is in use.

3. The similarity or dissimilarity of established, likely-to-continue trade channels.

4. The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

5. The fame of the prior mark . . . .

6. The number and nature of similar marks in use on similar goods.

7. The nature and extent of any actual confusion.

8. The length of time during and the conditions under which there has been concurrent use without evidence of actual confusion.

9. The variety of goods on which a mark is or is not used . . . .

10. The market interface between the applicant and the owner of a prior mark . . . .

11.    The extent to which applicant has a right to exclude others from use of its

mark on its goods.

12.    The extent of potential confusion . . . .

13.    Any other established fact probative of the effect of use.

### b. Ex Parte Consideration of the DuPont Factors

Some restrictions exist with regard to the examination of an application during the prosecution phase, or ex parte.   For instance, the examiner must act on applications and registrations in order of the filing date and other information set forth therein.  Ownership of a trademark is determined by priority of use, not filing, so sometimes, the examination process results in a refusal to register a trademark that actually has priority of use in commerce, but was later filed. Because of the restrictions on ex parte examination, the examiner uses the DuPont factors, but in a more limited way commensurate with those restrictions.

In an ex parte case, the following factors from the DuPont list are usually the most relevant, and thus the most likely to appear in an examiner's statement of refusal to register under Section 2(d):

- *The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression:* The basic principle in determining confusion between marks is that marks must be compared in their entireties and must be considered in connection with the particular goods or services for which they are used. If the marks of the respective parties are identical, the relationship between the goods or services need not be as close to support a finding of likelihood of confusion as would be required in a case where there are differences between the marks.

- *The relatedness of the goods or services as described in an application or registration in connection with which a prior mark is in use:* The goods or services do not have to be identical or even competitive in order to determine that there is a likelihood of confusion. The inquiry is whether the goods are related, not identical. The issue is not whether the goods will be confused with each other, but rather whether the public will be confused about their source.

- *The similarity or dissimilarity of established, likely-to-continue trade channels:* It is sufficient that the goods or services of the applicant and the registrant are so related that the circumstances surrounding their marketing are such that they are likely to be encountered by the same persons under circumstances that would give rise to the mistaken belief that they originate from the same source. Because of established marketing practices, the use of identical marks on seemingly unrelated goods and services could result in a likelihood of confusion.

- *The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing:* The fact that purchasers are sophisticated or knowledgeable in a particular field does not necessarily mean that they are immune from source confusion. *See In re Decombe*, 9 USPQ2d 1812 (TTAB 1988); *In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983). However, circumstances suggesting care in purchasing may tend to minimize likelihood of confusion.

- *The number and nature of similar marks in use on similar goods:* The existence of third-party registrations alone cannot justify the registration of another mark that is so similar to a previously registered mark as to create a

likelihood of confusion, but third-party registrations may be relevant to show that the mark or a portion of the mark is descriptive, suggestive, or so commonly used that the public will look to other elements to distinguish the source of the goods or services.

- *A valid consent agreement between the applicant and the owner of the previously registered mark:* [W]hen those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't. A mere *assumption* that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not.

Finally, Section 1207.01(a)(iv) of the TMEP provides that there is no "Per Se" rule regarding likelihood of confusion. The facts in each case vary and the weight to be given each factor may be different in light of the varying circumstances; therefore, there can be no rule that certain goods or services are per se related, such that there must be a likelihood of confusion from the use of similar marks in relation thereto.

## VIII. Comparison of the Trademarks of LCI, MAHCO and Lewis & Clark Outdoors, Inc.

Now, with an explanation of the basic examination process and the factors used by the Examiner in determining likelihood of confusion, I turn to the progression and timing of filings and registrations by LC INDUSTRIES, LEWIS & CLARK OUTDOORS, and MAHCO, all of which are at issue in the present case.

### A. The LCI marks

Beginning in 2000, LCI had filed a number of applications, which, by 2008 had been issued the following registrations, copies of which are attached as Exhibit C.

**B.    The MAHCO marks**

In November of 2004, MAHCO filed application Nos. 76/620196 and 76/620199, attached hereto as Exhibit D, and extracts of which are shown below.   In each case, the examining attorney issued an office action, refusing registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d) based on a likelihood of confusion with U.S. Registration No. 2810912 for LEWIS AND CLARK BICENTENNIAL for " commemorative t-shirts, jackets, caps, sweatshirts and fleece outerwear, namely, jackets, vests, and sweatshirts." The LCI registrations, which had already been issued, were not cited as confusingly similar to the MAHCO application.

**C.    The Lewis & Clark Outdoors Marks**

In January of 2006, LEWIS & CLARK OUTDOORS, INC. filed an application for the mark LEWIS & CLARK OUTFITTERS and design.   The particulars of the mark, extracted from the database of the USPTO, are shown below.



| | |
|---|---|
| Word Mark | LEWIS & CLARK OUTFITTERS |
| Goods and Services | IC 035. US 100 101 102. G & S: retail store services featuring apparel, footwear and gear for climbing, paddle sports, biking, and backpacking. FIRST USE: 20000600. FIRST USE IN COMMERCE: 20000600 |
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Design Search Code | 02.01.01 - Busts of men facing forward; Heads of men facing forward; Men - heads, portraiture, or busts facing forward; Portraiture of men facing forward<br>02.01.30 - Business suits (men wearing); Men wearing two or three piece business suits<br>02.01.31 - Men, stylized, including men depicted in caricature form<br>02.07.01 - Groups, males<br>26.11.20 - Rectangles inside one another<br>26.11.21 - Rectangles that are completely or partially shaded<br>26.17.01 - Bands, straight; Bars, straight; Lines, straight; Straight line(s), band(s) or bar(s)<br>26.17.05 - Bands, horizontal; Bars, horizontal; Horizontal line(s), band(s) or bar(s); Lines, horizontal |

| | |
|---|---|
| Serial Number | 78784105 |
| Filing Date | January 3, 2006 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | September 9, 2008 |
| Owner | (APPLICANT) LEWIS & CLARK OUTDOORS, INC. CORPORATION ARKANSAS 404 SOUTH PLEASANT STREET SPRINGDALE ARKANSAS 72764 |
| Attorney of Record | Dennis D. Brown |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "OUTFITTERS" APART FROM THE MARK AS SHOWN |
| Description of Mark | Color is not claimed as a feature of the mark. The mark consists of PICTORIAL REPRESENTATIONS OF MERIWETHER LEWIS AND WILLIAM CLARK WITH THE WORDS "LEWIS & CLARK OUTFITTERS". |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

The Examining Attorney assigned to Application No. 78/784105 followed the proper procedure for examination as set forth in the T.M.E.P. summarized in Section VII of this report above.   A search report contained in the file history shows that a proper search was conducted. The results of that search prompted the Examiner to issue an office action on July 7, 2006 advising that 2 pending applications, 76/620196:



| | |
|---|---|
| Word Mark | LEWIS & CLARK OUTDOORS THE EXPEDITION CONTINUES |
| Goods and Services | (ABANDONED) IC 025. US 022 039. G & S: Footwear |

and 76/620199,



**Word Mark**          LEWIS & CLARK OUTDOORS THE EXPEDITION CONTINUES
**Goods and**          (ABANDONED) IC 018. US 001 002 003 022 041. G & S: backpacks, duffle bags and
**Services**           luggage

both owned by MAHCO, Inc., and both *filed* prior to that of LEWIS & CLARK OUTFITTERS

mark were confusingly similar to the LEWIS & CLARK OUTFITTER mark.

    **D.**    **Interaction Between the Parties outside the PTO:**

    As between MAHCO and LEWIS & CLARK OUTDOORS, LEWIS & CLARK had

priority of use.  The pleadings and evidence I have reviewed also indicates that by the time the

office action was issued, LEWIS & CLARK also had collected evidence of actual confusion by

consumers as to the source of MAHCO's goods and LEWIS & CLARK'S stores.  MAHCO's

LEWIS & CLARK folding chairs were being returned to LEWIS & CLARK OUTFITTER'S

high end outdoor and camping stores.  LEWIS & CLARK demanded MAHCO abandon its

applications, thus clearing its own path to registration, and also that MAHCO cease use of the

LEWIS & CLARK mark on folding camping chairs, alleviating the consumer confusion that was

taking place.  The dates of first use in commerce listed in the MAHCO mark indicated that

MAHCO had not begun its use of a LEWIS & CLARK mark until after LEWIS & CLARK

OUTDOORS had opened its retail stores under the LEWIS & CLARK name.  MAHCO agreed

to meet LEWIS & CLARK's demands.

    However, by now, LCI had also demanded that MAHCO cease use of its marks, on the

theory that MAHCO's marks were confusingly similar to LCI's.  The LCI registrations, which

were issued prior to the filing of MAHCO's marks, were not cited against MAHCO as bars to registration, even after LCI filed letters of protest at the PTO. This indicates that neither the Examiner nor the Director of Policy & Procedure at the PTO felt that the issuance of the MAHCO marks would be likely to cause confusion with the LCI marks or any of the third party marks utilizing LEWIS & CLARK.

LCI then sued MAHCO in federal court, ultimately settling the matter. Among other things, the settlement agreement demanded that MAHCO keep its applications alive long enough to assign the marks to LCI, but also required MAHCO to cease use of the marks. . MAHCO'S applications had been filed on the basis of intent to use, and could not be assigned to LCI until use had begun, as there is no property right to be assigned:

> *Extract from 15 U.S.C. §1060(a)(1). A registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark. Notwithstanding the preceding sentence, no application to register a mark under section 1(b) shall be assignable prior to the filing of an amendment under section 1(c) to bring the application into conformity with section 1(a) or the filing of the verified statement of use under section 1(d), except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing.*

The primary purpose of this provision is to ensure that a mark may only be assigned along with some business or goodwill, and to prevent "trafficking" in marks. See TMEP 501.01(a). However, it appears that trafficking was exactly what was taking place.

-12-

LCI entered into a settlement agreement with MAHCO, attached hereto as Exhibit E. The agreement contains several provisions that indicate LCI was acting with fraudulent intent:

- The agreement specifically indicates that MAHCO must assign intent to use applications 76/620196 and 76/620199 LCI, either within 6 months or following the execution of its agreement with Lewis & Clark Outdoors (which required that MAHCO cease use of its LEWIS & CLARK marks.)

- The second WHEREAS clause of the LCI/MAHCO agreement on p. 1 states that "*MAHCO has agreed to forgo all use of the MAHCO Mark...or any other mark or name containing the terms 'Lewis & Clark' or 'Lewis and Clark'*".

- The fifth WHEREAS clause of p. 1 states "*MAHCO has agreed to forego the use of all forms of the MAHCO Marks...,subject to the terms of this Agreement*"

- Paragraph 4 a of the agreement states that "*other than licensing as provided in this agreement, [LCI] will not make any use of any of the MAHCO Marks..., except to license same back to MAHCO pursuant to the terms of this Agreement or any subsequent agreement between LCI and MAHCO. Further LCI agrees that it will not license the MAHCO Applications, or any registrations resulting therefrom, to any party, at any time in the future, except to MAHCO.*"

A trademark is merely a symbol of goodwill and cannot be assigned apart from that goodwill. See *McCarthy on Trademarks & Unfair Competition*, Section 18.2. Thus, an abandoned trademark is not capable of assignment. Once the mark has been abandoned through nonuse, there is no property right left to be transferred to another. So if MAHCO had in fact, ceased use of the LEWIS & CLARK marks as set forth in its agreement to LEWIS & CLARK OUTDOORS

-13-

and in the Whereas clauses of the LCI agreement, there was no goodwill to attach to the applications, and the assignment of the applications for those marks was invalid.

LCI then requires that, *"To the extent necessary, MAHCO shall assist LCI (at LCI's expense) in taking any and all necessary steps to complete the transfer of the MAHCO Applications to LCI by executing Amendments to Allege Use, where possible, and by executing any documents required by the USPTO to properly and fully transfer the MAHCO Applications."*

Since MAHCO had agreed (to both LCI and LEWIS & CLARK OUTDOORS) that it would forgo use of the mark, it could not have truthfully executed such documents.

MAHCO is then required by LCI to acquiesce in/stipulate to a fraudulent fictional use theory invented by LCI to (1) get around the fact that, in truth, the MAHCO mark was actually abandoned.

Specifically, the concluding portion of paragraph 2 states that, *"Without limiting the generality of the foregoing, MAHCO will, concurrent with its execution of this Agreement, execute and deliver to LCI assignments attached hereto as Exhibit B.... MAHCO believes that Exhibit B will result in a valid transfer. Under no circumstances is the foregoing to be construed to require MAHCO to make false or misleading statements to anyone, including the USPTO, however MAHCO recognizes that the license agreement contemplated by this Agreement constitutes trademark use of the MAHCO Applications for more than 6 months beyond the effective date such that the transfer of the non-abandoned MAHCO Applications will occur.*

LCI then offers a license back of the mark to MAHCO: "MAHCO is permitted to fulfill orders taken prior to July 15, 2007, however, as of November 15, 2007, MAHCO will immediately and permanently cease and desist all use of, attempted use of, registration of,

attempted registration of, and reference to the MAHCO Marks in any way, shape or form worldwide. MAHCO will ship no product bearing the MAHCO Marks after November 15, 2007. This license will expire on November 15, 2007, subject to the provisions of Paragraph 7 hereof" (Paragraph 7 simply provides that LCI won't take action against any of MAHCO's customers, shippers etc. so long MAHCO complies with this agreement).

In order to stop the accrual of damages it was going to have to pay to Lewis & Clark, MAHCO had actually already stopped using the Lewis & CLARK mark at least a month before entering into its settlement agreement with LCI. Thus, it no longer had any bona fide intent to use the marks. Any assertion to the contrary would have been fraudulent, and further correspondence indicates that MAHCO understood that:

In an e-mail exchange sent from C. Kinne (MAHCO's attorney) to Jennifer Fitzgerald (LCI's attorney) dated 15 August 2007, Kinne states *"We're having difficulty with the REQUEST FOR EXTENSION OF TIME UNDER 37 C.F.R. SECT. 2.89. Dick [Mahan, MAHCO president,] wants to discuss it with his people. The statement that he has a bona fide intent to use in the future is causing him trouble, given the terms of the settlement."*

Jennifer Fitzgerald then responds with the following on the same day, *"Have him date it today, he's still using the mark, right?"*

Mahan's signature on the Exhibit B ASSIGNMENT OF TRADEMARKS is in fact dated 8/15/07.

Document Bates numbers LCI 8295-8296, attached hereto as Exhibit F. The recitals of good faith that exist in the agreement are meaningless if in fact there was no intention to use the mark, and MAHCO's assignment of an intent to use application for a mark that it had already

stopped using and which it did not intend to pursue meant that it had no bona fide intent to use the mark at all.

Also, concerning any products listed in the MAHCO registration or intent-to-use application which had not yet been sold under the MAHCO mark, the already expired July 15, 2007 cutoff establishes with certainty that no sales of these products under the MAHCO mark could ever possibly occur, even during the 3 month "license" period, so there could be no legitimate claim of bona fide intent.

There seems no other logical explanation for demanding an assignment of marks they had no intention of ever using except to use the MAHCO marks as bars to the registration of the LEWIS & CLARK application.

**E.    LCI'S record before the trademark office.**

**1.    LCI's arguments in prosecution**

In the case of its LEWIS N. CLARK registrations, LCI has, on several occasions, argued to the PTO that its mark makes a commercial impression that is deliberately distinct from, and not likely to be confused with LEWIS & CLARK, which is clearly a reference to the historical figures MERIWETHER LEWIS and WILLIAM CLARK.  In a May 24, 1990 response to an office action issued in its application 74/016757 where the Examining Attorney had cited a prior registration for the mark LEWIS & CLARK used on clothing, LCI made the following argument:

> *"Applicant further submits that a likelihood of confusion is even more remote due to the distinctions in the marks.  Registrant's mark, LEWIS & CLARK, clearly refers to the historic explorers of the Americas.  Applicant's mark, LEWIS N. CLARK, while alluding to the explorers, gives a more immediate impression of referring to a single person.  This*

*different commercial impression, coupled with the distinctions in goods and channels of trade shows quite distinctly that no likelihood of confusion exists between Registrant's mark used on denim clothing and Applicant's mark used on a complete line of travel accessories and certain specific articles of clothing."*

On October 10, 2001, in response to an office action issued in connection with its serial no. 76/133711 , in which the Examiner cited prior pending application 75/852469 for the mark LEWIS AND CLARK BICENTENNIAL, LCI submitted the following argument:

*"The cited applicant Marketing Group is attempting to register the names of the famous explorers Meriwether Lewis and William Clark, who were active in 1803, in the Oregon Territory, almost 200 years ago, as is evidenced by the mark LEWIS AND CLARK BICENTENNIAL. Applicant L.C. Industries makes no claim to these famous explorer's names, but it has over the last decade created a different fictional non-living individual and it has successfully registered this name."*

On February 7, 2002, in response to an office action issued in connection with its serial no. 76/256716, in which the Examiner cited 3 prior pending applications, all for the mark LEWIS & CLARK, LCI submitted the following argument:

*"Applicant respectfully states that there is no likelihood of confusion between any one of these marks and the applicant's LEWIS N. CLARK mark. Applicant's mark is perceived as a person's name, which happens to be a play on words. The mark is suggestive of the Applicant's travel products and clothing. Its presentation as a name more than adequately distinguishes it from each of the cited marks which clearly related to the LEWIS & CLARK expedition."*

And yet, in the opposition statement filed against LEWIS & CLARK OUTDOORS Application 78/784105, LCI argues that this application

> "is confusingly similar to its LEWIS N. CLARK trademark because, among other things, the primary element of the Applicant's mark is 'LEWIS & CLARK' which is virtually identical to Opposer's LEWIS N. CLARK mark."

**F.   LCI's Letters of Protest**

LCI exhibited similarly curious behavior when it filed a number of Letters of Protest. Letters of Protest are a mechanism to permit third parties to bring facts relevant to the registrability of the mark to the attention of the USPTO. The procedure is intended to achieve this objective without causing undue delay in the examination process and without compromising the objectivity or the *ex parte* character of the examination process. *In re BPJ Enterprises Ltd.*, 7 USPQ2d 1375 (Comm'r Pats. 1988).

In March of 2000, LCI submitted a number of letters of protest to the USPTO, attached hereto as Exhibit G, in the following applications:

1.   75/789850, LEWIS & CLARK, by the Brunswick Corporation for:

*Liquid and gas fuel burning stoves for picnic and camping use, replacement parts therefor; smoker grills; barbecue grills; portable fireplaces; portable electric and kerosene heaters; and gas, oil and electric lanterns; Sleeping bags; air mattresses for use when camping; camp pads in the nature of sleeping mats; and furniture for camping; Cookware, namely, pots, pans, non-electric griddles, and non-electric coffee percolators; dishes; portable coolers; portable ice chests for food and beverages; and soft sided, thermal insulated containers for food or beverage; Tents; accessories for tents, namely,*

*tent poles, tent stakes and tent stake hammers; screen houses in the nature of tents; and*

*canvas canopies; Fishing waders*

Here, LCI argued that it was clear error for the Examiner to have failed to cite LCI's previous registration for LEWIS N. CLARK against the Brunswick Corporation's mark. The letter of protest was denied with a statement by the administrator that the examining attorney's actions were not clear error.

2. Serial No. 75/728415 for the mark LEWIS & CLARK by West Dakota Ltd for a variety of goods, among them knives, passenger vehicles, watercraft, toys, retail, mail order and internet service goods.

Again, LCI argued that it was clear error for the Examiner to have failed to cite LCI's previous registration for LEWIS N. CLARK against the WEST DAKOTA's mark. And again, the letter of protest was denied with a statement by the administrator that the examining attorney's actions were not clear error.

3. Serial No. 75/380587, EXPLORERS OUTFITTERS LEWIS & CLARK for *clothing, namely, blouses, shirts, sweatshirts, vests, sweaters, pants, sweatpants and sweatsuits,* arguing that it was clear error for the Examiner to have failed to cite LCI's previous registration for LEWIS N. CLARK. This time, the letter was denied because it was untimely filed.

4. Serial No. 75/367156, LEWIS & CLARK for *clothing, namely, blouses, shirts, sweatshirts, vests, sweaters, pants, sweatpants and sweatsuits.* This Letter of Protest was also denied on the grounds that it was untimely.

In short, despite its earlier arguments to various examiners that LEWIS & CLARK was dissimilar in commercial impression to its own LEWIS N. CLARK, LCI filed letters of protest

arguing that Examiners committed clear error by failing to cite its **LEWIS N. CLARK** mark against applications for **LEWIS & CLARK**.

The concept of "File wrapper estoppel" essentially is intended to preclude a party from making arguments out of "both sides of its mouth." It is inherently illogical that an applicant can claim to the PTO examiner that its mark is not similar to a previously registered mark in order to gain registration, then turn and argue in litigation that the same mark, used in commerce, is likely to cause marketplace confusion. And yet that is exactly what LCI attempts here. In order to gain registration, it has consistently argued that LEWIS N. CLARK creates a commercial impression so different from LEWIS & CLARK that no likelihood of confusion exists. But in letters of protest and the oppositions it filed against MAHCO and LEWIS & CLARK OUTDOORS, it argues that the commercial impressions of the two are identical and that there is likelihood of confusion. File wrapper estoppel can be persuasive evidence in cases of likelihood of confusion. See *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F3d 463.

Curiously, LCI never filed any oppositions against the marks it protested by BRUNSWICK or WEST DAKOTA, which would have been the more straightforward and effective way of dealing with those applications.

However, that may have been because an opposition proceeding requires more evidentiary support than is necessary in the ex parte examination and prosecution stages, and LCI was well aware that it could not support the burden of proof necessary to sustain oppositions against the same marks regarding which it had filed letters of protest.

**F.    LCI's fraud upon the Trademark Office**

In September of 2000, LCI filed numerous intent to use applications for LEWIS N. CLARK:

| | |
|---|---|
| **Word Mark** | LEWIS N. CLARK |
| **Goods and Services** | IC 022. US 001 002 007 019 022 042 050. G & S: TENTS AND ACCESSORIES THEREFOR, NAMELY, POLES, STAKES AND STAKE HAMMERS, ALL SOLD AS A UNIT; SCREEN HOUSES IN THE NATURE OF TENTS, CANVAS CANOPIES; CLOTHESLINES, CLOTHESLINE KITS CONSISTING OF CLOTHESLINES, CLOTHESPINS AND CLOTHESLINE HOLDERS, ALL SOLD AS A UNIT; BUNGIE STRETCH CORDS; ALL PURPOSE WEB AND FABRIC STRAPS FOR HANDLING LOADS AND CARRYING BUNDLES. FIRST USE: 19890000. FIRST USE IN COMMERCE: 19890000 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76134098 |
| **Filing Date** | September 22, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 30, 2001 |
| **Registration Number** | 2716219 |
| **Registration Date** | May 13, 2003 |
| **Owner** | (REGISTRANT) Smerling, Inc. CORPORATION ILLINOIS 401 North Western Avenue Chicago INDIA 60612 |
| | (LAST LISTED OWNER) L.C. INDUSTRIES, INC. CORPORATION ILLINOIS 401 N. WESTERN AVENUE CHICAGO ILLINOIS 60612 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | MICHAEL J WEINSTEIN |
| **Prior Registrations** | 1656518;1744354;AND OTHERS |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name in the mark does not identify a living individual. |
| **Live/Dead Indicator** | LIVE |
| **Word Mark** | LEWIS N. CLARK |
| **Goods and Services** | (ABANDONED) IC 035. US 100 101 102. G & S: RETAIL STORE SERVICES FEATURING SPORTING GOODS, CLOTHING, CAMPING AND FISHING GEAR, WATERCRAFT, MOTORIZED VEHICLES, LUGGAGE AND TRAVEL |

ACCESSORIES; MAIL ORDER
CATALOG SERVICES AND ONLINE
RETAIL SERVICES FEATURING
SPORTING GOODS, CLOTHING,
CAMPING AND FISHING GEAR,
WATERCRAFT, MOTORIZED
VEHICLES, LUGGAGE AND TRAVEL
ACCESSORIES

| | |
|---|---|
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 76133705 |
| Filing Date | September 22, 2000 |
| Current Filing Basis | 1B |
| Original Filing Basis | 1B |
| Published for Opposition | July 3, 2001 |
| Owner | (APPLICANT) L.C. Industries, Inc. CORPORATION ILLINOIS 401 N. Western Avenue Chicago ILLINOIS 60612 |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | JOSEPH R. MARCUS |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Other Data | The name in the mark does not identify a living individual. |
| Live/Dead Indicator | DEAD |
| Abandonment Date | March 26, 2004 |

| | |
|---|---|
| Word Mark | LEWIS N. CLARK |
| Goods and Services | IC 008. US 023 028 044. G & S: HAND-OPERATED CAMPING TOOLS, NAMELY, KNIFE SHEATHS, AXE SHEATHS, SCISSORS, SAWS, MACHETES AND AXES. FIRST USE: 20030301. FIRST USE IN COMMERCE: 20030301 |
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 76133652 |
| Filing Date | September 22, 2000 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1B |
| Published for Opposition | February 19, 2002 |
| Registration Number | 2782356 |
| Registration Date | November 11, 2003 |
| Owner | (REGISTRANT) L.C. INDUSTRIES, LLC CORPORATION ILLINOIS 401 NORTH WESTERN AVE. CHICAGO ILLINOIS 60612 |
| | (LAST LISTED OWNER) L.C. INDUSTRIES, INC. CORPORATION ILLINOIS 401 N. WESTERN AVENUE CHICAGO ILLINOIS 60612 |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | JOSEPH R. MARCUS |
| Prior Registrations | 1656516;1744354;AND OTHERS |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Other Data | The name in the mark does not identify a living individual. |
| Live/Dead Indicator | LIVE |

| | |
|---|---|
| Word Mark | LEWIS N. CLARK |
| Goods and Services | IC 021. US 002 013 023 029 030 033 040 050. G & S: PORTABLE COOLERS; PORTABLE ICE CHESTS FOR FOOD AND BEVERAGES; AND SOFT SIDED, THERMAL INSULATED CONTAINERS FOR FOOD AND BEVERAGE. FIRST USE: 20020101. FIRST USE IN COMMERCE: 20020101. |
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 76133533 |
| Filing Date | September 22, 2000 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1B |
| Published for Opposition | July 3, 2001 |
| Registration | 2919246 |

| | |
|---|---|
| **Number** | |
| **Registration Date** | January 18, 2005 |
| **Owner** | (REGISTRANT) L.C. Industries, Inc. CORPORATION ILLINOIS 401 N. Western Avenue Chicago ILLINOIS 60612 |
| | (LAST LISTED OWNER) L.C. INDUSTRIES, INC. CORPORATION ILLINOIS 401 N. WESTERN AVENUE CHICAGO ILLINOIS 60612 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Howard R. Fine |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name in the mark does not identify a living individual |
| **Live/Dead Indicator** | LIVE |

As shown in the extracts above, LCI filed each of the applications based on Section 1(b) or Intent to Use. Later, LCI filed the requisite Statements of Use indicating that it had used its LEWIS N. CLARK mark on all of the goods in each of the applications.

The applicant must submit one specimen for each class of goods/services in the statement of use before the statement of use can be approved. 37 C.F.R. §§2.86(b) and 2.88(b)(2). However, only one specimen for one class is needed to comply with the minimum filing

requirements. If at least one specimen is filed within the time permitted for filing the statement of use, specimen(s) for the other class(es) can be filed after the expiration of the statutory filing period, if the applicant verifies that the additional specimen(s) was in use in commerce before the expiration of the deadline for filing the statement of use. 37 C.F.R. §2.59(b).

Even though only one specimen per class of goods is required for the application to issue, the applicant must verify in its Statement of Use that it has used the mark on all of the goods in the application. The standard for fraud in an application is whether the applicant knew or should have known that he was making false, material representations of fact in connection with the application. Fraudulent claims of use in commerce will result in an invalidation of a registration or, in a multi-class application, invalidation of a class of goods. LCI had not, in fact, used the mark on all of the goods in the applications, see deposition of Michael Smerling, pages 195-199. When challenged on this point by LEWIS & CLARK OUTDOORS, LCI voluntarily surrendered the registrations that issued from each of these applications. See Defendant's response to Plaintiff's First Request for Admissions, Numbers 37-48, 60 and 61.

**FINDINGS AND CONCLUSION**

A.    **There is no likelihood of confusion between the marks at issue:**

It is my opinion that, given the actual use of the marks LEWIS N. CLARK on travel accessories and LEWIS & CLARK OUTFITTERS & design on retail stores featuring camping and outdoor equipment sold under various brands (but not LEWIS & CLARK) that when properly analyzed under the DuPont factors, there is no likelihood of confusion as to source. The theory of likelihood of confusion is simple in concept, but more complex in its application. The idea is that we want to protect consumers from confusion about the source of products, so that a shopper

does not buy product B when he intended to buy product A.  Analyzing the marks under the DuPont factors, I conclude as follows:

1.    *The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression.*  The marks clearly sound alike and contain common components, but they do create different commercial impressions, as argued by LCI in support of its own LEWIS N. CLARK registrations.

2.    *The similarity or dissimilarity and nature of the goods . . . described in an application or registration or in connection with which a prior mark is in use:* After sifting through the products and services on which LCI alleged use but later admitted otherwise, we are left with only the following goods sold by LCI:

LOCKS, NAMELY, METAL PAD LOCKS, LOCKS WITH KEYS, COMBINATION LOCKS AND CABLE LOCKS.

BUNGIE CORDS

PILLOWS

LUGGAGE, NAMELY, BRIEF CASES, DUFFLE BAGS, BACK PACKS, SECURITY WALLETS, SHAVING BAGS SOLD EMPTY, FANNY PACKS, TRAVEL WALLETS, [CONVERTIBLE SHOULDER BAGS, TIE CASES,] TRAVEL PACKS, TOILETRY CASES SOLD EMPTY AND LUGGAGE ACCESSORIES, NAMELY, [CARRIER BAGS DESIGNED TO TRANSPORT SHIRTS,] STRAPS FOR LUGGAGE AND BACKPACKS

WRISTBANDS FOR MOTION SICKNESS

PORTABLE COOLERS; PORTABLE ICE CHESTS FOR FOOD AND BEVERAGES; AND SOFT SIDED, THERMAL INSULATED CONTAINERS FOR FOOD AND BEVERAGE (the only verified use is on soft sided thermal insulated containers, and that use did not begin until 2003., well after LEWIS & CLARK opened its retail establishment)

LCI surrendered its registrations for the following goods, admitting that it had not used its LEWIS N. CLARK mark on tents or camping tools: TENTS AND ACCESSORIES THEREFOR, NAMELY, POLES, STAKES AND STAKE HAMMERS, ALL SOLD AS A UNIT; SCREEN HOUSES IN THE NATURE OF TENTS, CANVAS CANOPIES; CLOTHESLINES, CLOTHESLINE KITS CONSISTING OF CLOTHESLINES, CLOTHESPINS AND CLOTHESLINE HOLDERS, ALL SOLD AS A UNIT; BUNGIE STRETCH CORDS; ALL PURPOSE WEB AND FABRIC STRAPS FOR HANDLING LOADS AND CARRYING BUNDLES.

LCI admits both on its website, attached hereto as Exhibit H and through its principal in the deposition of Michael Smerling, page 310, that it is not engaged in retail sales, and while it may have had "interest" in retail stores, it may not have had any "intent" to open any such stores. The Plaintiff's only business is the operation of its retail store which sells outdoor equipment from various high end outdoor manufacturers. LCI admits that it never sold camping equipment or tents, despite its fraudulent allegations to the contrary submitted to the USPTO in Applications Nos. 76134098 and 76133652

-27-

3. *The similarity or dissimilarity of established, likely-to-continue trade channels.* LEWIS & CLARK OUTFITTERS has limited its use of the mark for the last 9 years to the operation of only retail stores. Though it has attempted to broaden its reach into the marketplace, when all is said and done, LCI is still selling the same goods it did 10 years ago, in the same channels of trade. There is no evidence to suggest that there will be any eventual overlap between the two parties.

4. *The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.* Testimony by the principals in each case establishes that most of the goods sold by LCI are priced at under $50, LEWIS & CLARK OUTFITTERS, on the other hand, sells expensive items in its stores, even offering financing for more expensive items.

5. *The fame of the prior mark.* This factor is not relevant in this analysis, as neither mark is famous.

6. *The number and nature of similar marks in use on similar goods.* As shown in Exhibit I, a number of third parties use LEWIS & CLARK or LEWIS AND CLARK on a variety of goods and services, many of which are related to outdoor activities in some way.

7. *The nature and extent of any actual confusion.* As there has been no evidence of actual confusion among purchasers of the product, this factor weighs in favor of no confusion.

8. *The length of time during and the conditions under which there has been concurrent use without evidence of actual confusion.* Despite coexistence for over 9 years, the parties agree that there is no evidence of actual consumer confusion

9.      *The variety of goods on which a mark is or is not used.*  LEWIS &
CLARK OUTFITTERS currently uses the mark only in connection with its retail establishments.
LCI has only established actual use of its mark on travel related items.

10.      *The market interface between the applicant and the owner of a prior
mark.*  There is little market interface between the two companies.  Lewis & Clark Outdoors
sells the equipment of others, like RIOT KAYAKS, through its retail stores in Springdale and
Rogers.  LCI sells its LEWIS N. CLARK travel products through other "big box" or "category
killer" retailers, such as Bed Bath & Beyond, sporting goods chains, luggage stores, book stores,
and airport concessions.  See deposition of Michael Smerling, pages 67-69.

11.      *The extent to which applicant has a right to exclude others from use of
its mark on its goods.*  The widespread use of LEWIS AND CLARK by third parties on a variety
of goods and services is evidence that the mark is weak and thus neither LCI nor LEWIS &
CLARK would be entitled to strict protection of the mark, and conversely would be unable to
broadly exclude others from using the marks.

12.      *The extent of potential confusion.*   To date, neither party has submitted
evidence that potential confusion of consumers exists or is likely. . .

13.      *Any other established fact probative of the effect of use.*  No other factors
appear to be relevant.

In summary, the commercial impressions of the marks are different, as argued by  LCI
when confronted with LEWIS & CLARK marks by Examining Attorneys during the registration
process, the channels of trade and relationship between the goods and services are disparate, the
price points of the merchandise sold in the Plaintiff's store are generally considerably higher than
that of LCI and thus likely to be subject to more careful scrutiny by a buyer, there are many uses

of LEWIS & CLARK by many parties on many different types of goods, which means that the marks are weak and entitled only to a narrow scope of protection. Despite a long coexistence, no evidence of actual or potential confusion among consumers exists.  All of the factors indicate that there is no likelihood of confusion between these two marks.

      **B.**     **LCI has a pattern of inconsistent and fraudulent behavior before the PTO which indicates unclean hands**

           **1.**    **File Wrapper Estoppel**

The landscape in this case is complicated by the inconsistent behaviors of LCI. LCI filed its opposition against the LEWIS & CLARK OUTFITTERS mark.  Reversing the position that LEWIS & CLARK and LEWIS N. CLARK were not confusingly similar, which it had taken earlier to support its own registration attempts, the opposition statements that LCI filed against both MAHCO and LEWIS & CLARK OUTDOORS indicated that LCI would suffer harm if either party was allowed to register marks containing LEWIS & CLARK.  This is file wrapper estoppel, which is persuasive evidence supporting the conclusion that there is no likelihood of confusion.

           **2.**    **Fraudulent Claims in the MAHCO Opposition**

In the MAHCO opposition, LCI raised its registrations 2716219 (for TENTS AND ACCESSORIES THEREFOR, NAMELY, POLES, STAKES AND STAKE HAMMERS, ALL SOLD AS A UNIT; SCREEN HOUSES IN THE NATURE OF TENTS, CANVAS CANOPIES; CLOTHESLINES, CLOTHESLINE KITS CONSISTING OF CLOTHESLINES, CLOTHESPINS AND CLOTHESLINE HOLDERS, ALL SOLD AS A UNIT; BUNGIE STRETCH CORDS; ALL PURPOSE WEB AND FABRIC STRAPS FOR HANDLING LOADS AND CARRYING BUNDLES)  AND 2782356, (for HAND-OPERATED CAMPING

TOOLS, NAMELY, KNIFE SHEATHS, AXE SHEATHS, SCISSORS, SAWS, MACHETES AND AXES)    as bases for the opposition, but in the deposition of Michael Smerling, LCI admitted that it had not ever sold these products.

3.    **The MAHCO Settlement Agreement**

LCI attempted a settlement of its claims with MAHCO, which attempted an invalid assignment of intent to use applications for marks that had been abandoned.  There seems no other explanation but that this was done in an attempt to block the issuance of the LEWIS & CLARK marks. The MAHCO applications, which had filing dates prior to that of the LEWIS & CLARK OUTFITTERS mark, were cited as bars to the registration of that mark.  Because applications must be acted on in order of their filing dates, as long as the MAHCO marks were alive, the LEWIS & CLARK OUTFITTERS mark cannot be issued a registration. Of course, the documents surrounding the assignment clearly indicate that there was nothing to assign. MAHCO had already stopped using the LEWIS & CLARK marks on its folding chairs, and had no bona fide intent to resume use. LCI clearly states in its settlement agreement that it had no intention to ever use the MAHCO marks that were the subject of the assignment.  Without any goodwill, the assignment of the trademark (and any application to register it) is no more than trafficking and is invalid.

4.    **The Letters of Protest.**

Despite the argument it had set forth in May of 1990 that LEWIS N. CLARK and LEWIS AND CLARK created such different commercial impressions that they could not be considered confusingly similar, in the spring of 2000, LCI filed letters of protest with the USPTO, arguing that marks containing LEWIS & CLARK or LEWIS AND CLARK were so likely to cause

confusion with its own LEWIS N. CLARK marks that it was clear error for an examiner to have failed to cite them. The letters of protest were denied.

LCI filed its opposition against the LEWIS & CLARK OUTFITTERS mark, again reversing its earlier arguments that LEWIS N. CLARK was not likely to be confused with LEWIS AND CLARK or LEWIS & CLARK, given that those marks were references to historical figures, the opposition statement against LEWIS & CLARK OUTDOORS indicated that LCI would suffer harm if the mark LEWIS & CLARK OUTFITTERS was allowed to register.

Although a number of LEWIS AND CLARK marks have been filed, published and then registered since LCI's registrations issued, LCI has only pursued 2 oppositions against LEWIS & CLARK marks, that against LEWIS & CLARK OUTFITTERS, and one against MAHCO.

All of the actions of LCI at the PTO, the reversal in its position, the attempt to fraudulently claim use of its mark on goods that it was not, in fact, using and then asserting the registrations that issued therefrom in an opposition against MAHCO and attempting to secure an invalid assignment of an abandoned mark for the purpose of delaying or preventing the issuance of a registration for LEWIS & CLARK OUTFITTERS indicate that LCI has attempted to bootstrap an argument that the LEWIS N. CLARK mark and the LEWIS & CLARK OUTFITTERS marks are confusingly similar and have priority over the LEWIS & CLARK OUTFITTERS marks, when an analysis of the marks and goods and services sold thereunder, following the DuPont factors, would suggest otherwise.

Rachel Blue
McAfee & Taft
500 ONEOK Plaza
100 West Fifth Street, Suite 500
Tulsa, Oklahoma 74103
(918)574-3007 (phone)
(918)574-3107 (fax)

    I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct and that this expert report was executed in Tulsa, Oklahoma, on this 11th day of May, 2009.

Rachel Blue